WOODMAN PEBBLING–MACHINE CO v. GUILD. See Case No. 17,981.

## Case No. 17,980.

### WOOD M. & R. CO. v. BROOKE.

[2 Sawy. 576;[1] 9 N. B. R. 395.]

District Court, D. Oregon. March 17, 1874.

SALE OF PERSONAL PROPERTY—PASSING OF TITLE.

1. An agreement concerning the sale of specific or ascertained chattels is prima facie a bargain and sale, and transfers the property therein to the purchaser, in consideration of his becoming bound to pay the price therefor; but the intent of the parties is to govern, and the contract may provide that the property in the chattel shall remain in the seller until payment, although the possession thereof be given to the buyer in the meantime.

[Cited in Heinbockel v. Zugbaum, 5 Mont. 344, 5 Pac. 901.]

2. Where C. & Co. had the exclusive right to sell the agricultural implements manufactured by the W. W. Co., in Oregon and Washington, and during the year 1873 C. & Co. ordered and received certain machines, with the understanding that they were to pay for them if sold within the year, and if not, that they were "to take them for the next season," and the transaction appeared upon the invoices of the W. W. Co. and the books of C. & Co. as a sale: *Held*, that the property in the machines passed to C. & Co. upon delivery, and upon their being adjudged bankrupts, to their assignee.

[This was an action in replevin by the Walter A. Wood M. & R. Co. against Lloyd Brooke, to recover the possession of certain machines.]

T. V. Schaup, for plaintiff.
William Strong, for defendant.

DEADY, District Judge. This is a petition asking that the plaintiff be adjudged the owner of thirteen reapers and five mowing attachments, now in the possession of the defendant as the property of the bankrupts, and for an order directing the defendant to deliver the same to the plaintiff.

From the petition, answer, stipulation and

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

evidence, it appears that the plaintiff is a corporation engaged in the manufacture of agricultural implements at Hoosick Falls, N. Y., and that E. S. Whitcomb is and has been for some years past the agent of the company for the territory west of the Rocky Mountains, with a place of business at San Francisco; that Whitcomb agreed in writing with Comstock & Co., of Portland, Or., to sell, during the year 1872, within the limits of Oregon and Washington, the implements manufactured by the plaintiff, exclusively to said C. & Co., to be by the latter resold within said limits and paid for during the year, unless shipped without specific orders from C. & Co., in which case the machines were to be paid for when sold; that on September 9, 1872, said C. & Co., at the request of Whitcomb, sent plaintiff an order for one hundred and forty machines for the season of 1873, whereby it was understood between the parties that the agreement of 1872 was substantially continued in force between them, with the right on the part of the plaintiff to terminate it at the end of any year; that the one hundred and forty machines above mentioned were shipped to C. & Co., at Portland, Or., before June 1, 1873, to be paid for, as appears from the bills of sale on September 1 of the same year, but in shipping the reapers, unmatched parts of six machines were sent by mistake for three perfect ones; that to correct this mistake, Whitcomb, on June 10, shipped to C. & Co. the parts of six other reapers to match those, with a letter of advice of June 5, explaining the transaction, and saying, "We do not expect you to pay for the machines this season, unless sold"—that is, the three extra ones not ordered; that on May 12, 1873, Whitcomb shipped to C. & Co. a lot of mowing attachments complete, in pursuance of their order of September 9, 1872, together with five other like machines, without any special direction or understanding concerning the same; that on June 23, 1873. C. & Co. wrote Whitcomb to send them "ten more reapers, and if we sell them this season we will pay for them; if not, we will take them for the next season; if you think favorable. ship them by sail; not insure;" that on June 26, 1873, Whitcomb shipped ten machines to C. & Co., in pursuance of this order, and by letter of July 4 advised them of the fact, and added, "we would be glad to send you ten more (machines), as we shall probably have some to carry here this season, and should you wish more now we will ship them on terms proposed by you in your last letter"—that is of June 23d, aforesaid; that the bills sent to C. & Co., for all said implements were made out without qualification or reservation: "C. B. Comstock & Co., bought of Walter A. Wood Mowing and Reaping Machine Co.; terms September 1;" with this notice printed on the margin: "No goods sent on commission;" except the one of June 10th, for the parts of six reapers sent to match those before missent, which contained no date as to terms.

That on January 12, 1874, C. & Co. were adjudged bankrupts, and the defendant thereafter appointed assignee of their estate, to whom six of said reapers and four of said mowing attachments were delivered by the agents of said C. & Co. as the property of the latter; that the bankrupts returned these implements, and others not found, in their schedule as assets of the firm, but afterward, on February 12, amended the same, so as to state that all of said thirteen reapers and five mowing attachments, not included in the order of September 9, 1872, if not sold prior to September 1, 1873, "should be and remain the property" of the plaintiff; that all the implements received from plaintiff were kept together undistinguished from one another, and whether the implements in the possession of the assignee are the ones mentioned in said amended schedule does not appear, except one reaper; and that said reapers cost one hundred and forty dollars apiece, and said mowing attachments sixty dollars apiece, in San Francisco, with fifteen and five dollars apiece, respectively, freight to Portland, which freight was paid by C. & Co.

Upon these facts the plaintiff claims that as to the thirteen reapers and five mowing attachments, C. & Co. were simply the agents of the plaintiff with authority to sell the same, and until a sale, that the property in the machines remained in the latter. In support of this proposition, counsel cites Meldrum v. Snow, 9 Pick. 444, and Reed v. Upton, 10 Pick. 523.

I do not think that the cases are in point. In Meldrum v. Snow it was proven to be the usage for brewers to supply retailers with beer in the spring. to be kept on sale during the summer at the risk of the former, and paid for by the latter, as and when it was sold. As against the creditor of the retailer, the court held that the property in the beer did not pass to the latter on the delivery.

It is well settled, that where payment before delivery is waived by the seller, and immediate possession given to the purchaser, upon an express agreement that the title is to remain in the seller until payment on a future day, or contingency, that the payment is a condition precedent to the property in the thing sold, vesting in the purchaser, notwithstanding the sale and delivery. 1 Pars. Cont. 449. So in the case cited, the usage was equivalent, in the judgment of the court, to an agreement between the brewer and retailer, that the property in the beer should remain in the former until a resale by the latter. But in the absence of any such usage or agreement the sale and delivery of the beer, although upon a payment to be made at a future day or a contingency yet to happen, would have passed the property in the beer to the purchaser at once.

According to the evidence, these machines

were all sold and delivered absolutely to C. & Co., without any agreement or reservation as to the title to the property. The only condition was the one in regard to the time of payment. That was a provision in favor of C. & Co., and amounted, in effect, to a stipulation that the machines were to be paid for when sold—whether in 1873 or 1874.

Beyond this there was no understanding between the parties, and probably the agreement should be so construed as giving the plaintiff the right to have payment at the end of the season of 1874, whether the implements were then sold or not.

In Reed v. Upton, supra, it was held that an agreement to sell a brick-pressing machine, upon payment therefor, on or before a future day, and also that the buyer should have the use of the machine in the meantime, followed by delivery under the latter stipulation, did not pass the property in the machine to the purchaser prior to the payment therefor.

But there was an express provision that the sale should not take effect until payment, and also that the delivery in the meantime was only to the use of the purchaser. An agreement concerning the sale of specific or ascertained chattels is prima facie a bargain and sale, and transfers the property therein to the purchaser, in consideration of his becoming bound to pay the price therefor; but the intent of the parties to the contract is to govern, and the agreement may provide that the property in the chattel shall remain in the seller until payment, although the possession thereof be given to the buyer in the meantime. Blackb. Sales, 147; 1 Pars. Cont. 440; Reed v. Upton, supra, 523.

The contract or transaction concerning these machines was a bargain and sale of them to C. & Co., and consequently transferred the property in them to the bankrupts, unless the parties thereto otherwise intended and agreed.

It is admitted that the one hundred and forty machines which C. & Co. first ordered for the season of 1873 were purchased outright, and that the property in them passed to the purchasers at the time of delivery on ship board at San Francisco. The machines in controversy were ordered and sent, or sent and received, upon the same terms as the others, except the time of payment. The invoices are all made out as absolute bills of sale. Nothing was said or done by the parties which indicates that the goods were merely sent on consignment to be sold on account of the plaintiff. On the contrary, the bills contain a notice that the plaintiff did not send goods on commission. C. & Co., when ordering the ten reapers direct, first, that they shall be shipped by sail, and then changed the order by telegraph, to steamer, and expressly direct the plaintiff not to insure. The plain English of all this is, that the parties understood that these machines were at the risk of C. & Co. as soon as deliv-

ered on board at San Francisco, and if destroyed by any casualty, the loss would be theirs. This is utterly inconsistent with the idea that it was intended and agreed that the property in them was to remain in the plaintiff, until a sale by C. & Co. Still further, the bankrupts, in their account with the plaintiff, credit it absolutely with all machines received in 1873, and enter those on hand on February 14, 1874, on their sworn schedules as assets of their estate; and the subsequent change of their schedule was not made until the arrival here of the plaintiff and his claim to the contrary.

Whitcomb also testified that the company never made a contract to sell their machines to any one for more than one year, and that they always reserved the right to change their agents, as he called them, every year, and effect was sought to be given to this testimony by counsel for plaintiff, as showing that machines sent by it to C. & Co., and not disposed of within the year, in some way reverted to the plaintiff at that time. Admitting this to be the general rule under which plaintiff did business, I do not see how it affects the question in this case.

If C. & Co. were not continued as the exclusive buyers and sellers of plaintiff's machines for Oregon and Washington in 1874, still by the terms upon which they received these machines, they had a right to keep them if not disposed of sooner, and sell them within the year 1874. In the meantime the machines would be at C. & Co.'s risk, and the plaintiff could not deprive them of the possession of them, although, as has been suggested, the right of the latter to have the price of them might become absolute at the end of the season of 1874, whether they were then sold or not.

On the other hand, it may be that C. & Co., if they were not continued as the exclusive buyers and sellers of the plaintiff's machines for 1874, would have a right thereafter to treat this sale as a conditional one of the class called "contracts of sale or return," and return the machines upon the ground that, as the plaintiff had materially deprived them of their opportunity to sell them, by withdrawing their exclusive right contrary to the implied understanding, their obligation to pay for them was at an end.

However this may be, I am satisfied that the transaction by which these machines were delivered to C. & Co. amounted to a bargain and sale, which, in the absence of any agreement or understanding to the contrary, transferred the property in them to the bankrupts.

This conclusion makes it unnecessary to consider the question whether the plaintiff, in case he was entitled to the possession of the thirteen reapers and five mowing attachments, not included in the one hundred and forty machines, ordered September 9, 1872, could have judgment for the possession of any like number and kind of machines of its

manufacture, in the hands of the defendant as the assignee of the bankrupts.

Although this proceeding is nominally a petition to the court for an order upon the assignee to deliver these machines to the petitioner, it has been heard and considered as an action of replevin tried by the court, without a jury.

This court has no authority to deprive the assignee of the possession of the property of the bankrupts without due process of law, which means in this case an action and trial by jury, unless the parties consent to a trial by the court. Smith v. Mason, 14 Wall. [81 U. S.] 429.

The rule in replevin is, that the thing sought to be recovered must possess indicia, or ear-marks, by which it may be distinguished from all others of the same description; therefore, replevin cannot be maintained for loose money, but may be for money tied up in a bag, and taken from the plaintiff in that state.

These machines are not·very readily distinguished from one another by their mere appearance, if at all. But the thirteen reapers and five mowing attachments might be distinguished from the one hundred and forty machines if they had been so kept that the parties having the custody of them could satisfactorily testify to their identity.· In this case, the evidence only shows that one of the machines in the hands of the assignee is one of the thirteen reapers.

But the claim of the plaintiff is, that there is a usage in this trade, to the effect that where machines are delivered, as in this case, and any number, not exceeding those sent without specific orders, or ordered to be paid for when sold, are left at the end of the season unsold, they revert to the company and become its property ex vi facti, for which it may maintain replevin. There was evidence tending to prove such a usage, but it was not sufficient. Besides, Comstock testified that he knew nothing of it, but purchased the machines to be paid for September 1, 1873, or when sold.

The plaintiff is not entitled to the possession of the property, and judgment must be given for the defendant for costs.